J-A17002-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| KHALIL MASON | : | |
| | : | |
| Appellee | : | No. 3127 EDA 2016 |

Appeal from the Judgment of Sentence August 29, 2016
In the Court of Common Pleas of Delaware County
Criminal Division at No(s): CP-23-CR-0000427-2015

BEFORE: GANTMAN, P.J., RANSOM, J., and PLATT, J.*

MEMORANDUM BY GANTMAN, P.J.: **FILED OCTOBER 24, 2017**

Appellant, the Commonwealth of Pennsylvania, appeals from the reinstated judgment of sentence entered in the Delaware County Court of Common Pleas, following the denial of the Commonwealth's post-sentence motion for recusal. We affirm.

The relevant facts and procedural history of this case are as follows. Appellee and two accomplices forcibly entered a home occupied by several college students and robbed them at gunpoint on October 9, 2014. Police arrested Appellee a few hours later, in possession of several stolen items. Appellee made a full confession to the police. As a result, the Commonwealth charged Appellee with robbery, aggravated assault, burglary, conspiracy, and related offenses. Subsequently, the Commonwealth offered Appellee a plea deal of 48 to 120 months'

_____

*Retired Senior Judge assigned to the Superior Court.

imprisonment, plus five years' probation, which he rejected. Appellee unsuccessfully litigated a motion to suppress on December 2, 2015, and the Commonwealth withdrew its plea deal.

On March 23, 2016, Appellee decided against his scheduled bench trial and entered an open guilty plea to two counts of robbery, one count each of aggravated assault, burglary, and resisting arrest, and to three counts of conspiracy. During his plea colloquy, Appellee confirmed that no one had promised him anything in return for his plea and that he had made the decision to plead guilty after he spoke with his grandmother and defense counsel. The court accepted Appellee's plea, denied the Commonwealth's request to proceed immediately to sentencing, and ordered a presentence investigation ("PSI") report, a psychiatric and psychological report, a drug and alcohol evaluation, sentencing memorandums, and a transcript of victim impact statements for sentencing purposes.

The court initially sentenced Appellee on May 17, 2016, to an aggregate term of forty (40) to one hundred twenty (120) months' imprisonment, followed by a consecutive term of ten (10) years' probation. After sentencing, the assigned ADA requested Appellee's prison phone calls and listened to a phone call between Appellee and his grandmother that occurred on May 18, 2016. During this phone call, Appellee allegedly told his grandmother that on the day of his scheduled bench trial, he spoke with and negotiated a sentence with the court's law clerk prior to Appellee's plea.

- 2 -

As a result, members of the Criminal Investigation Division ("CID") questioned defense counsel on May 26, 2016, about the law clerk's possible influence on Appellee's decision to plead guilty. Defense counsel told CID that on the morning of March 23, 2016, he informed the court and the ADA that Appellee wanted to proceed with the scheduled bench trial against counsel's advice. The court offered to arrange for Appellee to meet with his grandmother and defense counsel to discuss whether to enter a plea. Defense counsel said he then met with Appellee and his grandmother in a jury room later that morning, where defense counsel and Appellee's grandmother advised him to plead guilty. Defense counsel acknowledged the law clerk was present during this meeting but emphasized that the law clerk did not ever speak to Appellee or mention any type of sentence to defense counsel and/or Appellee.

Defense counsel said he also visited Appellee in the courthouse cellblock that same morning and again advised Appellee to plead guilty. The law clerk appeared at the cellblock at some point **after** defense counsel had arrived. Defense counsel said, "It was an insignificant…event that [the law clerk] was there [because] he wasn't participating in the plea negotiations," and explained that the law clerk merely asked defense counsel if Appellee was going to enter a plea. (**See** Interview of Defense Counsel, 5/26/16, at 7). Further, defense counsel clarified that the law clerk could not have negotiated a plea deal with Appellee in the cellblock without counsel's

knowledge because the law clerk arrived **after** defense counsel, and defense counsel observed Appellee during the entire time the law clerk was present in the cellblock.

CID interviewed the law clerk as well on May 26, 2016; he explained that one of his duties as a law clerk is to move along the process in the courtroom. The law clerk recalled going to the cellblock on March 23, 2016, but he denied making any suggestions about a possible sentence to Appellee if he pled guilty. The law clerk did not remember specifically what he said that day, but he claimed that he would have directed all comments to defense counsel. Next, CID interviewed the court on May 26, 2016; the judge confirmed that he had instructed the law clerk to go to the cellblock and learn from defense counsel if Appellee intended to plead guilty.

On May 27, 2016, the Commonwealth filed a post-sentence motion to "Vacate Sentence and Plea," and asked the court to vacate Appellee's plea and sentence, and to reassign the case to another judge. The Commonwealth improperly filed the motion with the President Judge of the Delaware County Court of Common Pleas. By order dated June 15, 2016, the court denied the Commonwealth's May 27th motion, without prejudice, and vacated Appellee's sentence to preserve the parties' rights. Meanwhile, defense counsel filed a petition to withdraw representation, which the court granted on June 7, 2016, after a hearing. That same date, the court appointed new counsel for Appellee.

Based primarily upon the prison phone call, the Commonwealth filed a motion for recusal with the court on June 23, 2016, alleging that, on the morning of Appellee's scheduled bench trial, the court's law clerk spoke to Appellee in the courthouse cellblock, asked Appellee if he thought he could win at trial when the victims were college students, told Appellee he could enter an open guilty plea, and told Appellee that the sentence would be "about like three years." (*See* Motion for Recusal, filed 6/23/16, at 2). In its motion, the Commonwealth concluded the court's impartiality in resentencing Appellee:

> might reasonably be questioned because: (a) the law clerk communicated *ex parte* with Appellee before his plea; (b) the law clerk told [Appellee] the approximate minimum sentence [the court] would impose; (c) [the court] imposed a minimum sentence just four months greater than the law clerk's approximation to [Appellee]; [and] (d) neither [the court] nor the law clerk disclosed the communications to the Commonwealth.

*Id.* at 3-4. The Commonwealth supplemented its motion with, *inter alia*, a recording of a May 18, 2016 prison phone call between Appellee and his grandmother, a transcript of their conversation, a transcript of defense counsel's May 26, 2016 interview with CID, and a summary of the court's and the law clerk's statements to CID during those respective interviews. Appellee filed an answer to the recusal motion on July 7, 2016.

The court held a hearing on the recusal motion on July 20, 2016. At the hearing, defense counsel said that, on the morning of March 23, 2016, he had a meeting in a jury room with Appellee and Appellee's grandmother

to discuss whether Appellee should plead guilty. Defense counsel believed Appellee had decided to plead guilty after the meeting. Regarding the law clerk's role in the plea discussions that day, defense counsel explained how the law clerk had helped to arrange the meeting in the jury room and his presence during the meeting; but the law clerk did not ever speak to Appellee and/or participate in any of the plea considerations. When asked about the law clerk's appearance at the cell block, defense counsel said he recalled the law clerk came to the cell block merely to inform defense counsel that the jury room was ready for the meeting. Significantly, defense counsel emphasized he would not allow anyone to communicate with Appellee, and the law clerk did not speak with Appellee at the cell block and/or at any other point before Appellee entered his plea.

The assigned ADA testified at the hearing that he was upset with Appellee's sentence and wanted to do what he could as a prosecutor to get a tougher sentence imposed. So, the assigned ADA requested Appellee's prison phone calls to see if Appellee "had lied to the Judge or was laughing about the sentence in any way." (N.T. Hearing, 7/20/16, at 45). The assigned ADA said he listened to the phone calls and heard Appellee tell his grandmother that Appellee had negotiated his sentence with the court's law clerk. Specifically, the relevant part of the transcript of the call provides:

> [Appellee]:        Yeah, but, ah, this it's crazy grandma I haven't told you about the one guy that was…talking with my lawyers the day of the trial. Like, I guess he work in the courtroom; you ain't never seen him on the side?

- 6 -

[Grandmother]: No.

[Appellee]: Listen, that—that guy he exactly told me what I'm gonna get, 'cause he like the Judge assistant or whatever. The day of trial.

[Grandmother]: Mm.

[Appellee]: Um, ah, like my lawyer feels all shaky about it and he came down he was like, "Yeah, well the Judge will be seeing you in a little bit." And then, um, I started talking to him he, like, "Yeah, well listen you think you will still win I know you—you side this story is true but you think you will win with college students and they side the story and all that."

[Grandmother]: Yeah.

[Appellee]: So, I asked him about an open plea. He's like, "Yeah you can still do it." And which I said, "You think they gonna give me, like, a two to four one and two?" He like nah, …he said, "I say about like three years and say you get your time credit." And he—he was exactly right. Like, when the, ah, DA.

[Grandmother]: Well.

[Appellee]: Said something.

[Grandmother]: Yeah—yeah.

[Appellee]: The DA said what you want me to do he was like you didn't see him in the corner, he's like, "Nah, you're not gonna do that just be cool." You would have had to watch him."

[Grandmother]: No, I didn't, where was he—where was he at?

[Appellee]: He was on the side, like, in a, sitting on a chair.

[Grandmother]: Oh, you talking about, like, he was,

like, in the jury chair?

[Appellee]:          Like, over there—over there, yeah.

[Grandmother]:     Yeah—yeah,—in the jury chair, like.

[Appellee]:          Yeah—yeah. Sitting like over there.

[Grandmother]:     Yeah, you know, where when they have a jury where they sit at.

[Appellee]:          Yeah, I know they (unintelligible).

[Grandmother]:     Because he was in that, he was—he was in that room when we was in that room that time.

[Appellee]:          Yeah, him—him—him that guy.

[Grandmother]:     Yeah, he seemed like a nice guy there.

[Appellee]:          Yeah, I guess he be controlling everything.

(**See** Transcript of Appellee's Jail Call, 5/18/16, at 5-6; R.R. at 107-108). The parties stipulated to the authenticity and admissibility of the recording of the May 18, 2016 jail call and its transcript, which the court allowed into evidence. (**See** N.T. at 21; R.R. at 34).

The trial court stated at the hearing that the assigned ADA appeared to be picking and choosing parts of this transcript to believe and not believe, while ignoring that Appellee and his grandmother also said the court did not quickly decide Appellee's sentence. (**See id.** at 70-72; R.R. at 83-85). Moreover, the trial court noted Appellee had made numerous inaccurate statements to his grandmother during their phone call. The assigned ADA

conceded Appellee had made several inaccurate comments and said, "it is always hard to accept everything that a Defendant is saying. Now [Appellee] already admitted in this phone call he lied to [the court] at sentencing about his drug usage." (**See id.** at 70; R.R. at 83). Further, the assigned ADA acknowledged Appellee had also lied to his grandmother during the phone call about striking one victim with a bottle. (**See id.** at 72; R.R. at 85).

The trial court denied the Commonwealth's recusal motion on August 29, 2016, and re-imposed the original judgment of sentence. The Commonwealth timely filed a notice of appeal on September 27, 2016. On October 4, 2016, the court ordered the Commonwealth to file a concise statement of errors complained of on appeal per Pa.R.A.P. 1925(b); the Commonwealth timely complied on October 24, 2016.

The Commonwealth raises the following issue for our review:

> ON THE DAY OF TRIAL, WITHOUT INFORMING THE PROSECUTOR, THE TRIAL COURT'S LAW CLERK TOLD [APPELLEE] THAT IF HE ENTERED AN OPEN GUILTY PLEA THAT DAY THE COURT WOULD IMPOSE A SENTENCE OF "ABOUT" THREE YEARS. [APPELLEE] ENTERED THE PLEA AND THE COURT IMPOSED THAT SENTENCE. DID THIS EVIDENCE DEMONSTRATE AN APPEARANCE OF IMPROPRIETY THAT WARRANTED THE COURT'S RECUSAL?

(Commonwealth's Brief at 3).

The Commonwealth argues Appellee's recorded statements created the appearance that the trial court had pre-decided Appellee's sentence, the judge's law clerk encouraged a guilty plea to move the case along, and the

law clerk and the court concealed their intentions and actions from the Commonwealth. The Commonwealth asserts its evidence demonstrated that the court instructed his law clerk to go to Appellee's cell block, where the law clerk suggested a possible sentence if Appellee would plead guilty. The Commonwealth contends these events occurred without the Commonwealth's knowledge and fed this appearance of impropriety. The Commonwealth also complains the court refused to confront the obvious appearance of impropriety, which damages the public confidence in the administration of justice. The Commonwealth claims the court instead disregarded the recording of Appellee's jail call, exonerated itself and the law clerk, and disparaged the Commonwealth's motives for challenging the court's impartiality. The Commonwealth further declares the law clerk's alleged statements to Appellee violated Rule 590 of the Pennsylvania Rules of Criminal Procedure.[1] For these reasons, the Commonwealth concludes the trial court abused its discretion, when it declined to remove itself from resentencing Appellee, and insists this Court should reverse the order denying the Commonwealth's motion for recusal, vacate the judgment of sentence, and remand the case for resentencing. We disagree with the

---

[1] The Commonwealth waived its complaint on appeal that the law clerk's actions violated Rule 590, because the Commonwealth failed to raise it in its court-ordered Rule 1925(b) statement. *See Commonwealth v. Castillo*, 585 Pa. 395, 888 A.2d 775 (2005) (stating as general rule, issues not raised in Rule 1925(b) statement will be deemed waived for appellate review).

Commonwealth's contentions.

"Where a jurist rules that he…can hear and dispose of a case fairly and without prejudice, that decision will not be overturned on appeal but for an abuse of discretion." *Commonwealth v. White*, 557 Pa. 408, 426, 734 A.2d 374, 384 (1999).

> In reviewing the denial of a recusal motion to determine whether the judge abused his discretion, we recognize that our judges are honorable, fair and competent. Based on this premise, where a judge has refused to recuse himself, on appeal, we place the burden on the party requesting recusal to establish that the judge abused his discretion.
>
> *     *     *
>
> The term "discretion" imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion, within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

*Commonwealth v. King*, 576 Pa. 318, 322-23, 839 A.2d 237, 239-40 (2003) (internal citations and quotation marks omitted). Our Supreme Court explained: "In general, a motion for recusal is properly directed to and decided by the jurist whose participation the moving party is challenging." *Id.* at 322, 839 A.2d at 239 (internal citations and quotation marks omitted). "It is the burden of the party requesting recusal to produce evidence establishing bias, prejudice or unfairness, which raises a

- 11 -

substantial doubt as to the jurist's ability to preside impartially." ***White,***

***supra*** at 426, 734 A.2d at 383-84 (1999).

> The inquiry is not whether a judge was in fact biased against the party moving for recusal, but whether, even if actual bias or prejudice is lacking, the conduct or statement of the court raises an appearance of impropriety. The rule is simply that disqualification of a judge is mandated whenever a significant minority of the lay community could reasonably question the court's impartiality.

***Commonwealth v. Druce***, 796 A.2d 321, 327 (Pa.Super. 2002), *affirmed*,

577 Pa. 581, 848 A.2d 104 (2004).

> Further, disqualification motions are not limited to judges who preside over trials, but extend to other proceedings, including sentencing. Our Supreme Court has explained:
>
>> [T]he largely unfettered sentencing discretion afforded a judge is better exercised by one without hint of animosity toward appellant…. [A] defendant is entitled to sentencing by a judge whose impartiality cannot reasonably be questioned.

***Id.***

> The sentencing decision is of paramount importance in our criminal justice system, and must be adjudicated by a fair and unbiased judge. This means, a jurist who assess[es] the case in an impartial manner, free of personal bias or interest in the outcome. Because of the tremendous discretion a judge has when sentencing, a defendant is entitled to sentencing by a judge whose impartiality cannot reasonably be questioned. A tribunal is either fair or unfair. There is no need to find actual prejudice, but rather, the appearance of prejudice is sufficient to warrant the grant of new proceedings.

***Commonwealth v. Rhodes***, 990 A.2d 732, 748 (Pa.Super. 2009), *appeal*

*denied*, 609 Pa. 688, 14 A.3d 827 (2010) (quoting ***Druce, supra*** at 588,

848 A.2d at 108). "In turn, once the judge decides whether to preside over the case, that decision is final and the cause must proceed." **King, supra** at 322, 839 A.2d at 239.

Instantly, the Commonwealth had the burden to show the trial court abused its discretion when it denied the Commonwealth's motion for recusal. On October 3, 2016, the court issued findings of fact and conclusions of law to support its decision. In general, the court rejected the Commonwealth's cause of action, finding the only credible evidence came from defense counsel, "who plainly and unequivocally and without contradiction testified there was not direct communication as alleged by the Commonwealth." (**See** Findings of Fact/Conclusions of Law, filed 10/3/16, at 9-10).

Specifically in response to the Commonwealth's contentions, the trial court stated:

\* \* \*

I. Findings of Fact

4. The Commonwealth alleged the Trial Judge's law clerk when instructed on the morning of trial to obtain a case status report (*i.e.* plea or trial) from the defendant's lawyer then in the prisoner lock-up area of the court house where defense counsel, …, was meeting with his client, instead negotiated a plea and sentence directly with the inmate defendant, despite the immediate presence of defense counsel, a 40 year practitioner and a former prosecutor with an unblemished professional record, who subsequently flatly, repeatedly and emphatically denied any such occurrence whatsoever, including but not limited to while so testifying under oath.

5. The Commonwealth's call for the Trial Court's recusal

is premised only upon the assigned [ADA]'s subjective interpretation of essentially three (3) lines (of six hundred and thirty six (636) lines) in an eavesdropped jail call between the 20-year-old defendant and his grandmother who raised him, on the day AFTER the defendant was sentenced to 40 months to 120 months incarceration with an additional ten (10) consecutive years of post-incarceration supervision for his role in a home invasion burglary victimizing college students in Chester, Delaware County, Pennsylvania.

6.     The record reveals that the [ADA] on his coming to the conclusory interpretation of the alleged impropriety did not account for the proper context of the recorded exchange between the grandmother and the son-like grandchild while [the ADA] listened to the jailhouse telephone call and was moreover extrapolating unsupported inference(s) when driven by some vague and personal dissatisfaction with the case's outcome and inexperience.   [The ADA] assigned his own yet tortured interpretation of what he overheard in the transcript which this [c]ourt finds completely incredible in light of the Commonwealth's subsequent investigation and record.

7.     The instant Motion for Recusal is what grew out of that which the assigned [ADA] acknowledges is his dissatisfaction with the sentence handed down by this Judge.

8.     The result of the exhaustive review of this record has yielded the repeated consistent statement from the defendant's attorney, …, then present in lockup on the morning of trial when the law clerk was dispatched by the Trial Judge to ascertain plea/trial status and whether a face to face conference room meeting between the defendant and his grandmother arranged by the court would be helpful to the defendant in finally deciding to plead or proceed to trial, is that there were no such *ex parte* communications between the law clerk and the defendant of the kind, nature or substance as averred and alleged by the Commonwealth.   The court specifically credits [defense counsel's] testimony and accepts it as grounded in firsthand knowledge of the truth and reality.

- 14 -

9.      Further, [defense counsel] relatedly testified he would neither permit nor tolerate any such conversation between a law clerk and his client.  Again, this testimony is specifically credited and consistent with the realities one would expect from a respected, seasoned and experienced member of the bar.

*    *    *

11.     First, [the assigned ADA] testified in conclusory fashion that he listened to a phone call between the defendant and his grandmother wherein he characterized the defendant as "indicating he negotiated his sentence with the Judge's law clerk."  No such statement, phrase and/or conversation exists and such is [the assigned ADA]'s interpretive conclusion and not the words of the participants in the call and the substance of the actual call.  Further, the substance of the actual call is so equivocal as to meaning and the persons referred to therein that this court finds [the assigned ADA]'s extrapolated misshaped interpretation to be overreaching, overly strained, too tenuous and lacking any reasonable and/or sufficient factual predicate foundation to make his interpretation probable.   Therefore, this [c]ourt expressly rejects his testimony regarding the proper interpretation of the jail call between the defendant and his grandmother.

12.     On the day of sentencing all counsel met with the presiding Judge in the robing room where a sentencing conference was conducted and sentencing concerns were reviewed prior to going on the record.  At that conference, the presentence investigation report, psychological, psychiatric and drug & alcohol evaluations, memorandums, guidelines and victim testimony were all discussed and reviewed.   The presiding Judge reiterated the general ranges he was considering.

13. The record of the defendant's sentencing proceedings was opened by [the assigned ADA] who commenced with a recitation of the charges to which the defendant pled guilty to on March 23, 2016.  The issue of restitution was noted to be addressed in the Commonwealth's sentencing memorandum and the various witnesses that would be called in furtherance of the

- 15 -

presiding Judge's pronouncement of sentence. [Defendant's grandmother] was called to testify on behalf of the defendant. … She apologized to the victims. Next, the [defendant's mother] was called who explained that financial hardship resulted in the defendant encountering different types of pills and explaining that her son had made poor choices on the night in question. Also, [defendant's stepmom] testified. She testified that the defendant has a child who needs its father present. [Defendant] then testified thanking his family for supporting him and apologizing to his victims.

14. The Commonwealth's position in this matter is untenable where it asks this court to engage in the parsing and self-serving cherry picking of statements contained in the purported jail call transcript (which remains unsigned unverified and uncertified) and would literally have this court in certain other salient respects engage in flip-flopping and summarily discredit this jail call evidence and concomitantly at the same time credit certain portions only to the extent such purportedly supports [the Commonwealth's] recusal application while just ignoring the uncontradicted and credible testimony of [defense counsel] to the contrary. Stated another way, the Commonwealth came to court essentially waving an unsigned and unverified jail call transcript and said, Your Honor believe what we say this transcript says because WE say it, BUT don't believe the rest of the transcript, as it is a lie because WE say so. This court points out that such an analytical method or mechanism of analysis for truth is neither reasoned nor well grounded. This method is plainly too subjective, pushes logic and is a patently uncertain methodology for fair truth determination beyond reason and assessing veracity. This Jurist flatly rejects and discredits the Commonwealth on this basis.

15. The Commonwealth cannot meet its burden of producing sufficient, credible evidence for this Jurist's recusal by printing a jail call transcript and inventing a meaning, and confusingly compound the matter by further stating in that in the very same transcript there are material portions [the Commonwealth contends] are untrue. The record of how the Commonwealth argues to substantiate its claim underscores the remoteness of the

- 16 -

basis of their claim and the palpable lack of substance and tenuousness and meritless nature of its proposition.

16.    Specifically, the Commonwealth without reasoned explanation contends the defendant is lying and not being truthful and honest in the jail call with his grandmother with respect to taking drugs and striking the victim with a bottle, but then does a reversal and yet argues the defendant is actually not being dishonest and untruthful in some parsed statement [the Commonwealth contorts] to mean the Judge should recuse himself because his law clerk allegedly negotiated the defendant's plea and sentence and/or engaged in some impermissible *ex parte* communication.   Mindful of the fact that none of these words or phrases utilized by the Commonwealth are actually uttered by the defendant in the jail house call or even anything closely resembling the same, but are instead the contrivances of [the assigned ADA]….  …

17.    This court cannot credit all these inconsistencies in the Commonwealth's case.    [The assigned ADA]'s testimony flatly contradicts itself and this Jurist shall not assign it any weight or credibility.    If the proper interpretation of his "explanation" for his "upsetness" and dissatisfaction with the defendant's sentence was his desire to vindicate the victims in some way as is the best interpretation of his rambling incohesive explanation, if any, such directly contradicts his testimony he knew the very day of sentencing where he stood silent and said nothing about any "upsetness" or dissatisfaction on multiple occasions where he had a clear opportunity to place it on the record.

18.    There is, of course, yet another explanation for the Commonwealth's dissatisfaction and [the assigned ADA]'s "upsetness" with this Jurist's sentence contained in the record which this [c]ourt finds persuasive.   Reference is made to the line (N.T. 07/20/16, 37, 14-23) of testimony elicited at the July 20, 2016 hearing wherein the Commonwealth advocates a "practice" of sorts or "expectation" that a defendant should expect to receive a harsher ("longer") sentence upon conviction if the defendant rejects the Commonwealth's pre-trial negotiated guilty plea offer and/or proceeds to file and go forward

with litigating pre-trial issues. Essentially, the Commonwealth acknowledged that it has an expectation that if a defendant doesn't accept and rejects [the Commonwealth's] guilty plea offer, [the defendant] will face a more severe sentence from the Judge simply for exercising constitutional rights and actively engaging in a defense strategy such as filing a pre-trial suppression motion as was done in the instant case. This documented exchange clearly betrays the reasons for the Commonwealth's dissatisfaction and "upsetness" in this matter.

19. The only credible evidence provided at the recusal hearing was from the Commonwealth's first witness, defense counsel, …, who plainly and unequivocally and without contradiction testified there was no direct communication as alleged by the Commonwealth.

II.    Conclusions of Law

*    *    *

5.    Against the foregoing facts and precedent, this Jurist believes unequivocally no reasonable observer would question his impartiality in re-sentencing the defendant in this matter. It is noted at the outset that in the immediate aftermath of the original sentencing in conference with the victims who expressed appreciation and satisfaction with sentence imposed. The assistant district attorney who was also present and involved in the discussion expressed no dissatisfaction with the sentence imposed, as he so testified in the instant hearing.

6.    Further, this is not a situation where the allegation of bias or prejudice or partiality against the presiding Judge is premised upon a relationship with the defendant or the other parties in the case. … The bias, prejudice or partiality that is alleged is not of fixed mind to impose a maximum sentence. …

7.    Also, the events immediately after the law clerk went to lock up as instructed also demonstrate no appearance of impropriety, that is, arrangements were immediately undertaken to have the defendant's grandmother meet

with him in a conference room, to which the [assigned] ADA admits he was aware.

8.    The Commonwealth grossly misconstrues, misshapes and skews any impact and import and significance of any holding cell statements by a law clerk in the obvious calculus of this defendant's decision to enter an open guilty plea where the record is clear the defendant labored for over a year through three attorneys and numerous listings struggling to decide whether to plead or proceed with trial. This [c]ourt, experienced practitioners and attorneys who have applied any material professional time within our criminal justice system and certainly any practitioner who has applied their professional time representing criminal defendants in these situations knows or has the experience to know such fanciful dramatic plot twists, such as an 11th hour passing comment by a law clerk in the aisle of the holding cell on the morning of trial that supposedly completely sways and precipitates the instantaneous negotiation of a plea and sentence and total reversal of a defendant such as this who resisted pleading for over a year as his case languished in the system is nonsensical, unrealistic and flatly not grounded in any reality.

9.    Even if one focuses on the assertion that there was some reference to the minimum portion of the defendant's sentence in any even adds no additional merit, legal substance or utility whatsoever to the Commonwealth's position in light of the fact that even [the assigned ADA] testified that he believed the defendant shall likely serve at least seven (7) years in prison in light of the actual sentence imposed, of course, with an additional ten (10) years of state supervision.

10.   Under all of these circumstances of this case, it is clear that the trial court's impartiality cannot reasonably be questioned in re-sentencing and reinstating the original sentence of the defendant.

11. This Jurist has thoroughly, rigorously and exhaustively examined the entire record of this case with respect to his own impartiality, bias and/or prejudice. The self-assessment has ranged from reviewing this case from its inception through the entry and withdrawal of counsel

for both the Commonwealth and the defendant to pre-trial litigation, trial, the open plea and sentencing as well as the post-sentence activities in this case. This Jurist's conduct and the conduct of his staff and those for whom he is responsible has adhered to strict rules of professionalism and has been squarely consistent with this Jurist's conduct in presiding over hundreds of cases. The [c]ourt consistently exhibited restraint, patience and collegial accommodation of both the Commonwealth and the defendant throughout numerous listings and re-listings and conferences designed to frame the pertinent case issues for the efficient, fair and just disposition of the case under consideration of all the material circumstances.

12. Also, this Jurist concludes under the circumstances of this case that there is also no reasonable concern that his continued involvement in this case created an appearance of impropriety and/or would tend to undermine public confidence in the judiciary. In fact, the opposite is true. Under this record, which is plainly driven by the disappointment of the [assigned ADA], who believed the defendant should have received a harsher sentence because he litigated a suppression motion, then subjectively embellished a tortured interpretation of a jail call as a means to remove this Jurist from the case for the chance at the desired sentence through another Judge. Necessary public confidence in the judiciary demands that courts do not succumb to efforts to supplant their inherent decision making authority, whether such influences are exerted by the Defense or Commonwealth. This Judge believes unequivocally that public confidence in the Judiciary is best served by a Judge who will not cede his sentencing authority to an ingrained or unspoken systematic policy where defendants are *ipso facto* expected to receive a harsher sentence merely because they exercise their constitutional rights or do so on threat of a more severe sentence.

13. In this case, the Commonwealth failed to meet their burden of producing evidence to corroborate their allegation that an appearance of impropriety or partiality or prejudice occurred in this matter as the record is clear.

(*Id.* at 1-14) (internal footnotes, citations to record, and testimony chart

- 20 -

omitted). We agree. The record contains no evidence to support the Commonwealth's allegations of an appearance of impropriety or establish that the court erred in refusing to recuse itself at Appellee's re-sentencing. *See King, supra*. Accordingly, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/24/2017